IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## WESTERN DISTRICT—PITTSBURGH, 1888.

### APPEAL OF JACOB REESE.

[Bessemer Steel Co. v. Jacob Reese.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS NO. 1
OF ALLEGHENY COUNTY.

Argued November 9, 1887—Decided October 1, 1888.

(*a*) In pursuance of an offer made, an inventor contracted with a company to assign to them certain letters patent and the inventions, methods and processes covered by applications for letters patent made by him then pending in the patent office, and the letters patent which might issue thereon, for three described processes and inventions "together with all other letters patent and applications therefor, if any," which belonged to him, "relating to or connected with the manufacture of pig iron, iron or steel ingots, blooms and billets, and the conversion or treating of iron or steel into rails, blooms, billets or plates," the assignments to "cover and embrace any and all re-issues, renewals, improvements, or extensions of the said letters patent now issued, or which may hereafter be issued, under the said applications or any modifications thereof."

(*b*) By a supplemental instrument executed by himself alone, but under seal, the inventor agreed that the former contract should "embrace in and among the inventions and improvements which I shall be bound thereunder to assign and transfer; . . . . . any and all processes in the metallurgy of iron and steel or devices for the manipulation of the same relative to the manufacture of pig iron, iron or steel ingots, blooms, billets and plates, which I may hereafter invent and apply to have patented, during the continuance of the foregoing agreement, and also any letters patent which may issue for such processes and devices," provid-

(392)

ed the company "shall elect to take, own and possess the same; such processes and devices when transferred to the said company at its request, to be subject to all the provisions of the foregoing agreement with the same effect in all respects as if they had originally been mentioned therein."

1. Construing said instruments, the subsequent inventions, together with the subsequent applications for patents therefor, and patents actually granted, were clearly brought within the original contract and made a part of it, depending only upon the election of the company.

2. The term, improvement, designated the invention itself, and the inventor must be held to have agreed to transfer whatever inventions he had then discovered in relation to the subjects described, though not then patented, or applications for patents for them, though not then made.

3. The inventions included in the contract, to be assigned and transferred, were not to be limited to such as related only to the manufacture of iron or steel into rails, ingots, blooms and billets, but included also such as were connected with the metallurgy of iron and steel.

4. A bill filed by the company for the ascertainment and administration of the rights of both parties to the contract, in the inventions and patents affected thereby, made a case proper for equitable interference, even without a cross-bill, and a decree made establishing such rights and decreeing performance and an injunction was affirmed.

Before GORDON, C. J., PAXSON, STERRETT, GREEN and WILLIAMS, JJ.; TRUNKEY and CLARK, JJ., absent.

No. 164 October Term 1887, Sup. Ct.; court below, No. 325 September Term 1882, C. P. No. 1.

On July 28, 1882, a bill in equity was filed by The Bessemer Steel Company, Limited, against Jacob Reese and The Harrison Wire Company, praying upon the facts averred: (1) That an injunction be issued restraining Jacob Reese from selling, assigning or transferring certain inventions, letters patent, or applications for letters patent, mentioned and described. (2) That the rights of the plaintiff under, and the true and proper construction of, certain agreements of said Jacob Reese with the plaintiff, dated September 25, 1879, and November 5, 1879, be declared and stated, and that said Reese be directed to execute and deliver to the plaintiff proper assignments of the inventions, letters patent, and application for letters patent, specified in the bill, "upon the payment by your orator (which your orator hereby offers to make), of such sums of money as under the said agreements" the court should decree to be due.

(3) That a certain written instrument made by said Reese with The Harrison Wire Company be declared invalid and void, and decreed to be canceled.   (4) Other and further relief.

The Harrison Wire Company, doing business at St. Louis, Mo., was not served and did not answer, but an answer having been filed by Jacob Reese, the other defendant, on October 13, 1884, *Mr. William S. Pier* was appointed examiner and master, whose first report, filed on September 22, 1886, found substantially these facts:

The plaintiff is a limited partnership organization in Philadelphia, under the act of June 2, 1874, and its supplements; its constituent members, consisting of ten corporations, one limited partnership and five natural persons, practically comprising all the manufacturers in the United States of what is known as Bessemer steel.   A prominent feature of the plaintiff's business was the purchase and control of patent rights, and the granting of licenses to use the inventions, a monopoly of the use of which had been secured to it by letters patent or applications therefor.

In the summer of 1879, the defendant, Jacob Reese, was the patentee and owner of numerous letters patent, and applications for letters patent, appertaining to the manufacture of iron and steel, and among others several relating to the "basic process" and the "open-hearth process," and intended to accomplish improvements in the Bessemer manufacture by desulphurizing and dephosphorizing or otherwise refining or purifying the metal operated on.   Mr. Reese's business then and since was, and has been, that of an inventor and metallurgist in the iron and steel industries.

In July, 1879, negotiations were begun between the plaintiff and defendant for the sale and transfer to the former of patent rights.   Pursuant to plaintiff's request, defendant, on September 1, 1879, addressed a written statement or prospectus of certain patented inventions, concerning which he offered to make any arrangement which might be to the mutual interest of the two.   This statement embraced a number of patents already granted to Mr. Reese, and a number of applications pending, with one of which was a reference to a notice of interference between an application by S. G. Thomas and himself.

On September 4, 1879, Mr. Reese submitted to Mr. Andrew

Carnegie, connected with the plaintiff company, the following proposition:

In consideration of $1 to me paid, receipt whereof is hereby acknowledged, I hereby agree to transfer, sell, assign to you the exclusive right to use all and every patent either granted or applied for, together with all renewals, re-issues or improvements of the same which can be used or relate or apply in any way to the Bessemer or pneumatic process in the United States, transfers to be made as required by your attorney, upon your agreeing to pay me cash, $5,000 and a royalty of five cents per ton upon every ton of ingot made by the so-called Thomas & Gilchrist process, and under this patent, until said royalty shall reach the sum of $10,000 per annum, after which no further payment is to be made; this sum being the maximum to be paid in any one year. You to have sixty days in which to accept or reject this proposition.

In witness whereof I hereunto attach my hand and seal this 4th day of September, 1879.                    JACOB REESE.

This proposal was presented by Mr. Carnegie to the plaintiff at the regular meeting of its managers about the time of its date, and was by them declined, the reason assigned by its secretary in a letter to Reese being because he stipulated for a royalty on the Thomas process instead of his own, thereby implying (as the letter said) the validity of the Thomas patents as not interfering with his. In this letter, dated September 9, 1879, the plaintiff invited a renewal of the negotiations, and clearly intimated a desire that its refusal of his option should not be treated as a finality, but that the offer, if modified as to the Thomas patents as proposed, would be accepted. Accordingly negotiations were renewed, and on the 25th of the same month the parties met in Philadelphia, when the following contract was signed:

Memorandum of agreement, made and entered into this 25th day of September, A. D. 1879, between Jacob Reese, of the city of Pittsburgh and state of Pennsylvania, of the first part, and the Bessemer Steel Company, Limited, of the city of Philadelphia and the said state, of the second part.

The said parties, for themselves, their executors, administrators, successors and assigns, in consideration of the premises and the sum of $1, by each paid to the other, the receipt of

which is hereby acknowledged, hereby covenant, promise and agree to and with each other, as follows, to wit:

1. That the said party of the first part will sell, transfer and assign to the said party of the second part, and the said party of the second part will buy from him, the following described letters patent, issued by the United States, belonging to the said party of the first part, viz.:

Letters Patent, No. 55,710, dated June 18, 1866.

Letters Patent, No. 57,969, dated September 11, 1866.

Letters Patent, No. 65,830, dated June 18, 1867.

Letters Patent, No. 193,551, dated July 24, 1877.

Letters Patent, No. 219,519, dated September 9, 1879.

And also, the inventions, methods and processes covered by applications for letters patent made by the said party of the first part, which are now pending in the patent office of the United States, as well as the letters patent which may be issued thereon, for (1) a method or process of decarbonizing and desiliconizing metals in a gannister-lined converter, and dephosphorizing the metals in a basic-lined vessel; (2) a three-period invention with three vessels and hot blast, and (3) a method or process for desiliconizing and decarbonizing metals in a silicous-lined vessel, and further refining it in an open-hearth, with or without basic lining, together with all other letters patent, and applications therefor, if any, which belong to the party of the first part, relating to, or connected with, the manufacture of pig iron, iron or steel ingots, blooms and billets, and the conversion or treating of iron or steel into rails, blooms, billets or plates, and together, also, with any and all rights, if any, which the said party of the first part has, to receive or recover royalties from parties who have by him been licensed to use any of the said patents, processes, or inventions in such manufacture, conversion or treating.

The assignments of the said letters patent now existing shall be made as soon as possible hereafter, and the assignment of such letters patent as may be issued under the said applications shall be made as soon as possible after the same shall be issued severally; it being understood, however, that before the party of the second part shall become bound under this agreement to pay for the said letters patent, or the inventions covered by the said applications, the title of the party of the

first part thereto shall be made satisfactory to the solicitor of the party of the second part, and the mode or form of assigning or transferring the same shall be approved by him. The said assignments shall also cover and embrace any and all re-issues, renewals, improvements or extensions of the said letters patent now issued or which may hereafter be issued under the said applications, or any modifications thereof, and any and every of them, and the party of the first part agrees to use all proper efforts to obtain extensions of the said letters patent, as they may severally expire.

2. Upon satisfactory assignments of the said letters patent, and the said inventions described in the said applications being made as aforesaid, the party of the second part will pay to the party of the first part the sum of $5,000, and, in addition thereto, will thereafter pay to him five cents upon every ton of 2,240 pounds of metal manufactured under the said letters patent, either by the said party of the second part or by other parties in pursuance of licenses granted by the said party of the second part; it being agreed and understood however, that the amount thus to be paid shall not in any one year exceed the sum of $10,000 for the number of tons of metal manufactured in that year, irrespective of the number of tons so manufactured.

\* \* \* \* \* \* \* \* \*

4. The said party of the first part will use diligent efforts to procure letters patent upon the said pending applications, and to sustain the said letters patent already issued, and if the said party of the second part shall hereafter, at the request of the said party of the first part, advance any sum or sums of money for the purpose of procuring or maintaining or defending the said letters patent, or any of them, in the office of the commissioner of patents of the United States, the said party of the second part shall have the right to deduct the amount of such advances, not exceeding the sum of $5,000 in the aggregate, from the first moneys which would be due under this agreement to the said party of the first part, in payment of the said sum of 5 cents per ton of metal manufactured, as aforesaid.

5. Upon the said assignments being made, as aforesaid, the party of the second part will, by proper instrument in writing,

give to the party of the first part, without any other consideration than is embraced in the premises to which this agreement relates, an exclusive license and control over the processes and methods described in the said letters patent and applications, [except?] so far, and so far only, as they relate to other metals than iron and steel, and the form of the said writing shall be subject to the˙ approval of the solicitor of the party of the second part.

6. To avoid misunderstanding, it is further agreed and understood that the said sum of 5 cents per ton is to be paid but once for the conversion of iron ore into pig metal, or through the finished processes into steel, whether the processes are carried through by one or several and different manufactures. If the manufacture shall end with the making of pig iron metal, then the sum stated is to be paid.

In witness whereof, etc. . . . . .

At the time of the execution of this contract, the plaintiff paid defendant on account of the consideration, $100, and a week later, a like sum, and on October 21st, following, $800. The next day, October 22d, defendant and his wife executed an assignment of the letters patent specified in the agreement, to the plaintiff, and the inventions, improvements and processes covered thereby, including any improvement, extension or reissue of said letters patent, or any of them which might thereafter be granted, made over or obtained, as fully and entirely as the same would have been held by the assignors or either of them had that assignment not been made. On the same day, the same assignors assigned to the plaintiff likewise the inventions and rights secured by the applications for letters patent specified in the agreement. Both these assignments were duly recorded in the Patent Office at Washington.

On November 5, 1879, the defendant executed the following paper, which was then attached to the agreement of September 25, 1879:

It is also agreed that the foregoing instrument shall embrace in and among the inventions and improvements which I shall be bound thereunder to assign and transfer to the said Bessemer Steel Company, Limited, any and all processes in the metallurgy of iron and steel or devices for the manipulation of the same relative to the manufacture of pig iron, iron or

steel ingots, blooms, billets and plates, which I may hereafter invent and apply to have patented during the continuance of the foregoing agreement, and also any letters patent which may issue for such processes and devices, provided the said Bessemer Steel Company, Limited, shall elect to take, own and possess the same; such processes and devices when transferred to the said company at its request, to ·be subject to all the provisions of the foregoing agreement with the same effect in all respects as if they had originally been mentioned therein.

Witness my hand and seal this 5th day of November, A. D. 1879.    JACOB REESE.    [L. S.]

No consideration is recited for the making of this instrument. The instrument, however, is under seal. On the same day that Reese sealed it, the plaintiff paid him $4,000, being the balance of the hand-money due him under the agreement of September 25, 1879.

After entering into the agreement of September 25, 1879, "Exhibit A" of the Bill, the defendant in good faith zealously devoted himself to the performance of his obligations thereunder. The assignments of the patents and inventions specifically required thereby were made and accepted by the plaintiff; counsel was at once retained by him, defendant, to defend the patents and press the applications, and under their advice, plaintiff consenting, he made applications for re-issues of three of the assigned patents, Nos. 65,830, 193,551 and 219,519, for the purpose of securing more extensive rights predicated on more comprehensive claims than were secured by the original patents. These re-issues were refused by the commissioner of patents, but not through any fault of defendant; he litigated effectively interference cases in the patent office growing out of the applications which he tendered to the plaintiff under the instrument of November 5, 1879; he made many new inventions which he admitted to be within the scope of his agreements of which he advised the plaintiff and which he tendered to it for acceptance or refusal, and he devoted his time, skill, learning and energy almost exclusively to these results and to inventing numerous improvements and processes appertaining to the metallurgy of iron and steel. For some time after making their agreement both parties seem to have been satisfied with the relationship thereby created.

Shortly after the last instrument had been consummated, the commissioner of patents decided an interlocutory appeal in a patent cause, Reese v. Thomas, involving the validity of one of the assigned inventions, in Reese's favor; and about this time the correspondence indicates entire harmony and mutual recognition of concurring interests. It so continued until in March, 1880, when Mr. Holly, the plaintiff's chief engineer, to whom it had referred the Reese inventions, made a report both as to the practical value of the processes therein, and as to the validity of his letters patent and applications, with special reference to their competition with the Thomas patents and applications, between which and Reese's there was such interference that both could not be valid. This report was against the validity of the Reese patents, or at least against those to which the report attributed value.

About the same time the same engineer reported, and plaintiff advised defendant, that none of its constituent members were willing to make experiments to test the value of defendant's processes. Henceforward until this bill was filed, a period of more than two years, the correspondence between the parties in evidence indicates that defendant was urging upon plaintiff its obligation to put in practice the assigned inventions, to pay him royalties thereon and especially upon the open-hearth steel made by its members, to furnish him with money necessary to make the proper applications for letters patent on new inventions, and for the support of himself and family, and was protesting against the plaintiff's conduct; and that the plaintiff, while insisting upon retaining its contract rights upon Reese's inventions, was intent upon investing as little money in them as possible. The plaintiff, having covenanted to pay defendant royalties on all metal produced under the assigned inventions, made no effort whatever to carry them into practice, or to make them successful and remunerative to defendant by the manufacture of iron or steel by their processes. Reese himself made numerous attempts to have them license the Shoenberger iron manufacturers of Pittsburgh, who had offered to pay a royalty of 25 cents per ton on all they might manufacture under his patents; but nothing came of them because of plaintiff's apparent disinclination to grant the licenses. He also applied to plaintiff for authority to procure iron manu-

facturers to take licenses from plaintiff at 25 cents per ton for metal produced under any one of his patents, or 50 cents per ton for the use of all; but his application was not answered. Plaintiff neither interposed objection, nor demand, nor claim, to the manufacture of open-hearth steel by any of its constituent members, though one of the patents assigned by defendant, to wit, No. 65,830, embraced in its claims the open-hearth process, and that kind of steel was made by several of its members.

Plaintiff not only did not put these inventions into practice so that they would earn royalties, but it refused to experiment with a view of ascertaining what might be accomplished by their use. Defendant frequently and urgently called plaintiff's attention to this neglect, and also to its failure to account for its use of the open-hearth process, and protested against it as being a breach of the contract between them, and he made demands for royalty arising out of the use of the open-hearth process, which were refused.

A principal motive tending to induce the defendant to make the contract was, that the plaintiff comprised in its membership all the Bessemer manufacturers in the United States, and by putting his patents into practical use it would make his royalties very valuable, and the plaintiff knew that this motive influenced him thereto.

In June, 1880, about three months after plaintiff's chief engineer had reported against the Reese processes, and after the refusal of plaintiff to make experiment thereof, the defendant requested an option of plaintiff to re-purchase his inventions and patents at the price of plaintiff's advances with interest, and was refused.

Under the several contracts between the parties the plaintiff paid and advanced the defendant $12,989.23 altogether, but at various times. Five thousand of it was paid as the cash consideration mentioned; $4,497.23 were advanced by plaintiff and charged against defendant on account of royalties; $1,000 was paid him pursuant to an agreement between them that he should release plaintiff's members from all claim for infringement or royalties that might have accrued prior to the contract; and $2,500 was paid him as the first instalment under the Carnegie contract of September 20, 1881 [hereafter], at that

date. The advances of $4,497.23 were for expenses in the patent office, counsel fees, etc., incurred in obtaining letters patent, filing claims, applications, etc., and traveling expenses, and were made from time to time upon defendant's demands. They were not made without much objection on plaintiff's part, and it made frequent demand for detailed statements of his expenditures, which defendant furnished in response thereto.

On December 31, 1880, defendant notified plaintiff that on certain dates specified he had applied for letters patent for eight different inventions, describing them, and asked plaintiff to elect whether it would take them or not. On March 25, 1881, plaintiff elected to take these inventions as offered.

On June 18, 1881, defendant notified plaintiff that he had filed applications at specified dates for letters patent on eight other different inventions, accompanying this notification by a statement of expenses incurred upon the applications and a balance of a former account rendered. Plaintiff paid to defendant the two items of this statement, one of them on June 20, 1881, and the other on June 23, together amounting to $1,280.17, and on July 15, 1881, it notified defendant that it elected to take the letters patent which might be issued on said applications.

In the summer of 1881, defendant complained to Andrew Carnegie, of the treatment he had received, that he had been unable to get money enough from the plaintiff to live on, and negotiations were thereupon begun between Mr. Carnegie and defendant for the assignment of the latter's rights growing out of the contracts of 1879. During these negotiations Mr. Carnegie offered defendant $20,000 for his said interests, and again $20,000 cash, and $5,000 per annum for five years, and at last $5,000 per annum during the time the contract of September 25, 1879, was operative. This last proposition was accepted, and on September 20, 1881, the following paper was executed and delivered:

Whereas the undersigned, Jacob Reese, and the Bessemer Steel Company, Limited, on September 25, 1879, did enter into a certain agreement relative to letters patent of the United States, and to applications for letters patent, to which agreement a supplement was added, dated November 5, A. D.

1879, which said agreements have been placed of record in the office of the commissioner of patents of the United States, in Liber T 26, page 134, of Transfers of Patents. Now it is hereby agreed, by and between the said Jacob Reese, party of the first part herein, and Andrew Carnegie, party of the second part herein, in consideration of the premises, as follows, to wit:

1. The said party of the first part hereby assigns, transfers and sets over unto the said party of the second part all his right, title and interest in and to the aforesaid agreements entered into between him and the Bessemer Steel Company, Limited, and in and to all rights reserved or acquired by him thereunder, including all rights to recover or receive royalties or fees for the use of any or all patents to which the said agreements referred.

2. The said party of the first part hereby agrees to and with the said party of the second part that he will faithfully do and perform all acts and services which, under the before referred to agreements, he became bound to do and perform.

3. The said party of the first part hereby agrees to and with the said party of the second part that he, the said party of the first part, will take, adopt and prosecute such methods and proceedings with reference to existing interferences now pending in the patent office of the United States between him and Sidney G. Thomas, Harmet and Osann, and with reference to obtaining re-issues of any or all letters patent referred to in the before-mentioned agreements, and with reference to applications for new or original patents instead of re-issues, as may be requested by the said the Bessemer Steel Company, Limited, the same to involve no further expense to the said party of the first part.

4. In consideration of the aforesaid assignment and undertaking made by the said party of the first part, the said party of the second part hereby agrees to and with the said party of the first part that he, the said party of the second part will pay to the said party of the first part the sum of $5,000 annually so long as the said agreements with the said the Bessemer Steel Company, Limited, shall continue to operate, and the said company, or its assigns, shall hold letters patent thereunder, the said amount to be paid in advance in equal half-yearly payments of $2,500 each.

5. The foregoing provisions shall enure to the benefit of, and bind the executors, administrators and assigns of the parties hereto, it being understood and agreed, however, that in case the said party of the second part shall assign and transfer this agreement to the said the Bessemer Steel Company, Limited, or to any six of the companies composing the same, all liability on the part of the said party of the second part individually, or of his executors, or administrators, under or by reason of this agreement, shall terminate and end.

In witness whereof. . . . .

On the day this agreement was executed the defendant received from the plaintiff on Mr. Carnegie's order, the first semi-annual payment of $2,500 provided for therein. It was one of the provisions of that instrument that Mr. Carnegie might assign it to plaintiff and without defendant's recourse to him, and it was understood at the time that Mr. Carnegie was representing the plaintiff; but Mr. Carnegie did not, in fact, assign to plaintiff the right secured until May 11, 1882. Prior to that and on the maturity of the second semi-annual instalment, defendant demanded payment of Mr. Carnegie of said instalment, was met by a request to meet him, Mr. Carnegie, at plaintiff's office in Philadelphia. This was not convenient for defendant, and instead of going there he drew on Mr. Carnegie at plaintiff's office, but the draft was returned unpaid.

A few days before this instalment became due, plaintiff wrote defendant, intimating that the money would not be paid until a list of his applications for patents should be furnished by him to plaintiff. March 18, 1882, defendant replied to this, protesting against a refusal to pay the instalment when due on any such ground, and offering to transfer all the patents that plaintiff was entitled to, and, in order that this might be determined, asking for a statement of plaintiff's claim which he might submit with the contracts to counsel for advice. This request was not complied with. The second payment was not made when due, and nothing but the first payment has ever been paid under the contract of September 20, 1881.

On April 3, 1882, defendant sent to plaintiff a list of his patents and of applications made by him. The plaintiff still refused to pay the $2,500, but made a new condition precedent,

that he should assign to it all the inventions to which it was entitled, and in all respects perform his contract, but in no way specifying what inventions he should assign, or what other acts he should perform.

On April 29, 1882, the defendant assigned to The Harrison Wire Company all his right, title and interest, limited to Jackson county, Ill., in and to certain letters patent and applications therefor which were among those tendered to the plaintiff and by it accepted, but none of these so assigned had been accepted by the plaintiff prior to July 24, 1882, the date of the notice hereinafter set forth, though all of them were on the list furnished on April 3, 1882. At the time of this assignment to The Harrison Wire Company, the latter had actual notice of the contract of September 25, 1879, and November 5, 1879, between plaintiff and defendant.

On July 24, 1882, Mr. Reese served upon the plaintiff the following notice:

PITTSBURGH, July 24, 1882.

To THE BESSEMER STEEL COMPANY, LIMITED:

GENTLEMEN: Owing to the failure on your part to comply with your contract obligations under the contract between us, dated September 25, 1879, and supplement of November 5, 1879, as modified by my agreement with Andrew Carnegie, of September 20, 1881, which was assigned to you, and your constant failure and refusal after demand to pay me the instalment of $2,500, due me on March 20, 1882, I now rescind and annul said contracts, and notify you of the same.

Yours truly,          JACOB REESE.

The plaintiff then filed this bill.

From the foregoing facts found by the master, and especially from the refusal of the plaintiff to pay the defendant the moneys due under the contract of September 20, 1881, until he performed demands of so general a nature as to be impracticable, the master found that the plaintiff did not act in good faith, but made a palpable and wilful breach of its obligations under the contract.

The master then found as conclusions of law:

1. That the inventions which the defendant was in law bound to assign to plaintiff, "were all those which were spe-

cially mentioned in the agreement of September 25, 1879, and those which belonged to the defendant at that date, whether patented or not, if letters patent were afterwards applied for, which related to or were connected with the manufacture of pig iron, iron or steel ingots, blooms and billets, and the converting or treating of iron or steel into rails, blooms, billets or plates, and also all those inventions specifically set out in the sixth paragraph of the bill, together with all re-issues, renewals, improvements or extensions of the letters patent issued for the same," with three exceptions: (1) an improvement in regenerative metallurgical furnaces; (2) an improvement in making lime brick; (3) an improvement in the production of ferrophosphorus.

2. That as equity had jurisdiction to enforce a contract for the sale of a patent right: Cogent v. Gibson, 33 Beav. 557; 1 White & T., Lead. Cas. in Eq., 4th Amer. ed., 1070, the plaintiff could have the relief by specific performance which it prays, but because, as a rule, whenever the equity of a party under his contract is not clear, or his case is unconscionable or inequitable, courts of equity refuse specific execution and leave the party to his action at law to recover damages for his breach of the contract: Weise's App., 72 Pa. 354, equity would decline to enforce this contract and leave the plaintiff to his remedy at law: 3 Pom. Eq. J. 400; Henderson v. Hays, 2 W. 148; Ewing's App., 18 W. N. 29.

3. That the injunction granted at the preliminary hearing should be dissolved.

4. The master then proceeded: Reese agreed by the first instrument, as part of the consideration moving to the plaintiff for the payments aforesaid, to use diligent effort to procure letters patent on pending applications, and to sustain those already issued, and to obtain extensions of those expiring; also by the Carnegie agreement, that he would take, adopt and prosecute such proceedings with reference to existing interferences pending in the patent office between him and certain others with reference to re-issues, and applications for new or original patents instead of re-issues, as the plaintiff might request. After having received a material portion of the consideration, can he even, after proving bad faith and oppression in the other party, escape from his obligation by rescission?

The master does not think so. For his injuries sustained there are ample remedies, and a proper application to the tribunals established for such purpose would have given him full relief. Therefore, the only effect which his letter of July 24, 1882, had, was to terminate the privilege of election which plaintiff up to that time enjoyed under the instrument of November 5, 1879.

The plaintiff's continuing obligation was at first to pay royalties, changed by the Carnegie agreement to semi-annual instalments of $2,500. Only one of these instalments has been paid, that on September 20, 1881. The plaintiff is therefore in default to the defendant in these semi-annual instalments since March 20, 1882, with interest thereon from the dates of their respective maturities.

We have now determined what inventions defendant agreed to sell the plaintiff; that the latter was not entitled to a specific performance; that the injunction should be dissolved; that the equitable title to certain of Reese's inventions is in the plaintiff, and that defendant is trustee therefor with a lien for further performance; and that plaintiff owes to defendant a sum of money.

There ought to be a decree entered in this case which would be a finality of all disputes and litigation between these parties arising out of these contracts. But the plaintiff is not entitled to equitable relief, and the defendant has not asked for it. Were there a cross-bill here which would warrant it, the master would recommend that a decree be entered in favor of the defendant for the sum of money indicated to be paid, upon his assigning and transferring to the plaintiff the legal title to the inventions in which the plaintiff now has an equitable title, as hereinbefore indicated. In the absence of such cross-bill, or prayer, he can only recommend that the injunction be dissolved and the bill be dismissed at the costs of the plaintiff.

The master submits herewith his minutes, the testimony taken, and the form of a decree, in conformity with the foregoing.

Exceptions filed by both parties were overruled by the master, and being renewed on the filing of the bill, the court, STOWE, P. J., on argument, did not agree with the master

that the bill in the case must be dismissed, but thought a decree could be made under which justice might be done to both parties, and an end made to the controversy; and the court was of opinion that a decree should be made requiring the defendant to convey and assure to the plaintiff the several patents found by the master to belong to it, upon payment of the money due under the terms of the contract of date September 20, 1881. An order was therefore made referring the cause back to the master to ascertain and report specifically what patents were to be conveyed to the plaintiff, with power to take further testimony if necessary.

The master afterwards filed a supplemental report, specifying by their patent numbers and as exhibits, the "inventions belonging to the defendant on September 25, 1879, whether patented or not, if letters patent were afterwards applied for," which were to be conveyed to the plaintiff under his first conclusion of law, ruling that certain patents and applications for patents for processes productive of results which could not be classified with rails, blooms, billets or plates, were not to be brought within the definition set forth in his former report, and approved by the court, circumscribing the inventions to be conveyed, and should not be embraced in the decree.

On the coming in of this report, with certain exceptions thereto overruled by the master, the court, STOWE, P. J., filed the following opinion:

The master was mistaken in assuming in his report that the court had already absolutely indorsed his construction of the contract between plaintiff and defendant Reese in regard to what patents, etc., the latter had agreed to sell and transfer to plaintiffs. The question as now presented was not raised by any exception filed by plaintiff, nor was it considered by the court.

The great matter under the former argument was whether the finding of the master that the bill should be dismissed, should be sustained. If so, then everything else was immaterial. If not, then, indeed, the question of what should be conveyed by defendant to plaintiff became important, and it was only after decree that we discovered that any serious question arose in regard to it, and it was to learn to what

patents, etc., the master referred when he said in his report that defendant was bound to assign to plaintiff all those specified in "Exhibit A" and those which belonged to defendant on September 25, 1879, whether patented or not, if patents were afterwards applied for, which related to, or were connected with, the manufacture of pig iron, iron or steel ingots, blooms and billets and the converting or treating of iron or steel into rails, blooms, billets or plates, etc., etc. Now this is the exact language of the contract of the parties as set out in "Exhibit A," and throws no more light upon what particular patents, etc., involved in this controversy than does the contract itself.

It is true that the argument of the master indicates that he gives a limited interpretation to the agreement, restricting it to such patents, etc., only as were connected with the manufacture of iron or steel into rails, ingots and billets, and not such as were connected with the metallurgy of iron or steel; it would have been somewhat difficult to except to his specific finding of fact.

As I understand the contract, "Exhibit A" and its supplement, "Exhibit B," they both cover exactly the same subject, the only substantial difference being that in the latter Reese agrees, in addition to what he had previously agreed, "to assign and transfer any and all processes," etc., as before, "which he may (might) thereafter invent and apply to have patented during the continuance of the agreement 'Exhibit A,' and also any letters patent which said Bessemer Steel Company shall elect to take," etc.

The case now presented covers the question fully and specifically, and must be met. A careful consideration of the contracts compels me to differ radically from the conclusion expressed by the master in regard to the extent of the agreements.

I am of opinion that defendant should assign to plaintiff all the patents, applications, etc., that are found by the master should be assigned. And also all the others found by the master should *not* be assigned, except patents No. 346,498 and No. 350,558 and "Exhibit No. 306," being an application for patent for invention of phosphate of lime for fertilizing. . . .

Thereupon, on July 6, 1887, a decree was signed ordering and requiring Jacob Reese to convey by proper conveyance

certain patents, described by their numbers, also certain inventions and applications for letters patent for the same, described as in numbered exhibits; perpetually restraining said Reese from assigning or transferring any of said inventions, letters patent or applications for letters patent, or from issuing or granting any licenses to use the same or any of them; and decreeing that the assignment by said Reese to The Harrison Wire Company, set out in the bill, be declared void and of no effect; that the plaintiff is indebted to the defendant in the sum of $32,110.83, to be paid forthwith to the defendant by the plaintiff upon the receipt by the former from the latter of the assignments of the inventions, letters patent or applications for letters patent hereinbefore mentioned or referred to, and that the plaintiff pay the costs, including a master's fee of $1,000. This decree is shown more fully in the Opinion of the Court.

Then the defendant took this appeal assigning as error the overruling of various exceptions to the original report of the master, and of various exceptions filed to the form and substance of the decree.

*Mr. D. T. Watson* and *Mr. S. A. McClung*, for the appellant.

*Mr. John Dalzell* (with him *Mr. Geo. B. Gordon*), for the appellee.

OPINION, MR. JUSTICE GREEN:

The chief contention of the parties to this litigation is upon the terms of their contract relation. That relation is evidenced by four distinct writings, which, while executed at different times, and not always by the same parties, are material, if not essential, in interpreting the stipulations involved in the controversy. They are the Carnegie option of September 4, 1879, the contract of September 25, 1879, the supplemental paper of November 5, 1879, and the new and final agreement of September 20, 1881. The first of these was a letter signed by Reese and addressed to Carnegie; the second was a formal contract made between Reese and the Bessemer Steel Company, Limited; the third was a supplement to the second sign-

ed by Reese alone; and the fourth is a new agreement made by Reese and Carnegie, drawing to it by express reference and appropriate words both the main contract with the Bessemer Steel Company, Limited, and the supplement thereto, but yet adding new terms and changing others contained in the previous papers. By proper instruments made with the sanction, and by the desire of Reese, whatever was personal to Carnegie in these several papers was turned over to the steel company, so that the company became the depositary of whatever rights and interests were vested ostensibly in Carnegie, in addition to those conferred upon the company by direct contract. The papers are continuous, and all relate to each other, and to subject matter common to all.

The controversy is upon the question whether the defendant was bound to assign to the plaintiff *inventions* as well as patents, and applications for patents, in existence on September 25, 1879, the date of the principal contract. The master held that inventions were included in the contract, but limited them to such as related only to the manufacture of iron or steel into rails, ingots, and billets, and denied that they included such as were connected with the metallurgy of iron or steel. The court held that all inventions which related to both these subjects were included, and decreed that the defendant must assign both classes. The defendant contends that both master and court were in error in holding that any *inventions* not patented or patents applied for at the date of the contract, were included within its operation. The decree adjudged that the plaintiff was entitled to have a conveyance of "those inventions which belonged to the defendant at the date of the said agreement, to wit, on September 25, 1879, whether said inventions were then patented or applications had been made for letters patent or not, if subsequently thereto letters patent were applied for which related to, or were connected with the manufacture of pig iron, iron or steel ingots, blooms and billets, and the converting or treating of iron or steel into rails, blooms, billets or plates." And the decree further adjudged as follows: "And the said plaintiff is also entitled to have conveyed to it by said defendant in and by the supplemental contract of date November 5, 1879, all such inventions as were tendered to it by the said defendant, and by it accepted, but

no others, for the reason that said contract is unilateral, and has been rescinded by the action of defendant, and in addition to the foregoing, all reissues, renewals, improvements, or extensions of the letters patent issued for the same." The decree further specified the inventions, applications, and letters patent which should be assigned by defendant, and directed the plaintiff to pay defendant thirty-two thousand one hundred and ten dollars, and eighty-three cents ($32,110.83), upon the making of the said assignments, all the costs of the case, and a master's fee of one thousand dollars ($1000). The defendant was also enjoined from selling or assigning any of the specified inventions, applications or letters patent or from granting any licences for using the same, and the grant made to the Harrison Wire Company was declared void.

The defendant, who is the appellant, contends that this decree is erroneous, chiefly because it includes patents and applications for patents which had no existence on September 25, 1879, the date of the main contract, and inventions which are not embraced within the meaning of that contract. So far as the patents and the applications are concerned, they are found by the court below to be for inventions which the defendant was bound to hold for the plaintiff, and to assign to it at the proper time by force of the contract between the parties. If this finding was correct, the circumstance of the patents and applications in question being subsequent in date to the contract, becomes immaterial, and the inquiry is narrowed down to the question whether *inventions* are embraced within the meaning of the contract as well as patents and applications.

The supplemental agreement of November 5, 1879, expressly stipulates "that the foregoing instrument (the contract of September 25, 1879), shall embrace in and among the inventions and improvements which I shall be bound thereunder to assign and transfer to the said Bessemer Steel Company, Limited, any and all processes in the metallurgy of iron and steel, or devices for the manipulation of the same relative to the manufacture of pig iron, iron or steel ingots, blooms, billets, and plates, which I may hereafter invent, or apply to have patented, during the continuance of the foregoing agreement; and also any letters patent which may issue for such processes or devices, provided the said Bessemer Steel Company, Lim-

ited, shall elect to take, own, and possess the same; such processes and devices, when transferred to the said company at its request to be subject to all the provisions of the foregoing agreement, with the same effect in all respects as if they had originally been mentioned therein." Depending only upon the election of the company the *subsequent* inventions, together with the subsequent applications for patents therefor, and patents actually granted were clearly brought within the operation of the original contract, and made a part of it. As the decree applied only to such of these as were tendered by the defendant, and accepted by the plaintiff, of course there could be no error in the decree so far as it embraced inventions made after the date of the supplemental contract. This leaves only remaining such inventions as were previously made, but for which no patents had been issued, nor applications for patents made.

The question is, were *such* inventions included within the meaning of the contract of September 25, 1879? They were not expressly named. But were they not intended to be embraced in its operation? It is difficult to understand why the parties should, by a subsequent and supplemental stipulation, expressly declare that the original contract should embrace any and all processes, etc., which the defendant might thereafter invent, and not provide, by either the original or supplemental agreement, that it should embrace the inventions which had already been made when the original agreement was executed, except upon the theory that both parties considered that the latter class of inventions were already included. A strong inference of such an intent in the original agreement arises from the mere fact that the defendant declared in writing subsequently that all the inventions that he should afterwards make should be embraced within the operation of the first agreement. But a still stronger inference to the same effect flows from the peculiar language employed in the second agreement, when referring to the first. The words are these: "It is also agreed that the foregoing instrument shall embrace in and among the *inventions* and improvements which I shall be bound thereunder to assign and transfer to the said Bessemer Steel Company, Limited, any and all processes," etc. That is to say, there are certain *inventions* and improvements which

I am bound to assign and transfer by the original agreement, and among them shall be such as I may hereafter *invent*. Clearly, and independently of a reading of the original agreement, here is a distinct and solemn assertion, not recognition merely, of the fact that *inventions* were embraced within its meaning, and within its obligatory operation, for the words are "which I shall be bound thereunder to assign and transfer."

But further; in the original agreement itself provision is made for "the *inventions*, methods, and processes covered by applications for letters patent, made by the said party of the first part, which are now pending in the patent office of the United States as well as the letters patent which may be issued thereon for" —three described processes and inventions. These constitute the second class of subjects to be assigned by the contract; and the third is described in the same continuing clause of the contract, thus, "together with all other letters patent and applications therefor, if any, which belong to the party of the first part relating to or connected with the manufacture of pig iron, iron or steel ingots, blooms and billets, and the conversion or treating of iron or steel into rails, blooms, billets or plates, and together also with any and all rights, if any, which the said party of the first part has, to receive or recover royalties from parties who have by him been licensed to use any of the said patents, processes, or inventions in such manufacture, conversion, or treating." The agreement next provides that the assignments of patents then existing shall be made as soon as possible, and of patents which may be issued under the applications, as soon as possible after they are issued; and then stipulates as follows: "The said assignments shall also cover and embrace any and all re-issues, renewals, *improvements*, or extensions of the said letters patent now issued, or which may hereafter be issued, under the said applications or any modifications thereof." Turning now to the Carnegie letter, September 4, 1879, which was the origin of the whole transaction, we find that the subjects of the future assignments are very broadly described. Thus: "In consideration, etc., I hereby agree to transfer, sell, assign to you the exclusive right to use all and every patent either granted or applied for, together with all renewals, issues, or *improvements* of the same which can be

used, or relate, or apply in any way to the Bessemer or pneumatic process in the United States."

We are seeking for the intention of the parties as to inventions, relating of course to the subject-matter, which had already been made, but neither patented nor patents applied for at the date of the contract, but for which applications were subsequently made, and for some of which patents were issued; they are described in part in the master's supplemental report. The term *improvement* is a technical one in the patent practice, and is almost always used to designate the invention itself in making out applications. Thus, in the master's report he describes numerous applications for patents, which the defendant notified the plaintiff on December 31, 1880, he had made, accompanied by a statement of his expenses in connection therewith. In all of them the invention is described as an "improvement," or "improved process," or "improved method." We find nothing therefore in the use of the word "improvements" which conflicts with its being intended to convey the same idea as the word "inventions;" on the contrary, it is manifest that they were used as synonymous terms throughout all the papers which passed between the parties. We are clear, therefore, that when the defendant stipulated in his letter of September 4, 1879, that he would sell and assign "the exclusive right to use all and every patent, either granted or applied for, together with all renewals, re-issues, or improvements of the same, which can be used, or relate, or apply, in any way, to the Bessemer or pneumatic process in the United States," he undertook to transfer whatever inventions he had then made relating to the "Bessemer or pneumatic process," whether he had at that time obtained patents therefor, or applied for them, or not. It seems to us that good faith requires this interpretation, otherwise he could hold back important inventions, which, in point of fact, were improvements upon patents then issued, or for which applications were then made, and by incorporating them into subsequent patents or applications, use them to the injury of the plaintiff. So, also, when the defendant agreed, in the contract of September 25, 1879, that "the said assignments shall also cover and embrace any and all re-issues, renewals, improvements, or extensions of the said let-

ters patent now issued, or which may hereafter be issued under the said applications, or any modifications thereof, and any and every of them," he must be held to have agreed to transfer whatever inventions he had then made in relation to the various subjects described in the previous part of the contract, although they were not then patented, or applications for patents for them were not then made. An improvement upon a patent then issued, or an application then made, might very easily be an invention which the defendant had then made, but withheld both from patent and application. If it were so in reality the plaintiff would be entitled to the benefit of it, though, in very words, "inventions then made" were not enumerated as subjects of assignment. Of course if it were not so in fact, the plaintiff would not be entitled to it. It seems, also, from the testimony, that the defendant himself so understood his contract, as he tendered several patents which covered inventions made prior to September 25, 1879, as appears by his letter of April 3, 1882. Without dwelling further upon this subject, we think the court below was right, as well as the master, in their views upon this branch of the case.

As to the other branch in which the master held that the expression "together with all other letters patent and applications therefor, if any, which belong to the party of the first part, relating to, or connected with the manufacture of pig iron, iron or steel ingots, blooms and billets, and the conversion or treatment of iron or steel into rails, blooms, billets or plates," embraced only such patents and applications as combined both of these features, we are unable to agree with him. We are clearly of opinion that the conjunction "and" is used in the cumulative sense and imports an additional and not a vastly restricted class of cases in which assignments were to be made. It is impossible to conceive that the same patent would cover the manufacture of pig iron, iron or steel ingots, blooms, and billets, *and also* the conversion or treatment of iron or steel into rails, blooms, billets, or plates. They are two en-tirely distinct subjects, and nothing but the most explicit and unmistakable language, associating them together as the object of a united patent, would justify a court in so holding. But there is no such necessity in the language of this agreement. To our minds the natural reading of the words embraces two

distinct subjects of applications and patents, one which relates to the manufacture of pig iron, iron or steel ingots, blooms, and billets, and the other to the conversion or treatment of iron or steel into rails, blooms, billets, or plates.  The method used is the common method of expression intended to indicate cumulative and not combined subjects to which anterior words in a sentence are intended to apply, and we know of no reason for reading the words in a different sense in this instance.  We have not been referred to any such reason, either in the testimony or by any authority.  We concur with the court in the view taken of this part of the case.

We see no reason for denying equitable relief in such a case as this.  No proceeding at law would be in any sense adequate. We think the master made an erroneous application of equitable maxims in deciding to dismiss the bill, the propriety— indeed the necessity—of which he ruled so forcibly and so well. In fact equitable intervention is as essential to the ascertainment and administration of the defendant's rights as of the plaintiff's. We are of opinion that the case was rightly decided by the learned court below, and therefore,

> The decree is affirmed and appeal dismissed at the costs of the appellant.